**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BFF II PTE. LTD. AND | : | |
| SIDE DOOR VENTURES, LP | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. 2:24-cv-1228 |
| v. | : | |
| | : | |
| | : | |
| MATTHEW ROSEN AND | : | |
| BLAIR JESSE REICH | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

BFF II PTE. LTD. ("BFF") and Side Door Ventures, LP ("Side Door" and collectively with BFF, the "Plaintiffs") file this complaint against Matthew Rosen ("Rosen") and Blair Jesse Reich also known as Aggroed Lighthacker or Aggroed ("Reich")(Rosen and Reich shall be collectively referred to as "Defendants**").**

## I.    PARTIES

1.     BFF is a private limited company organized under the laws of Singapore, with its registered office and principal place of business at 160 Robinson Road , No. 14-04, Singapore Business Federation Center, Singapore (068914).

2.     Side Door is Delaware series limited partnership with its registered office and principal place of business at 1400 Colorado Street, Suite C, Boulder City, NV 89005.

3.     None of Plaintiffs' members, partners, general partners, limited partners or owners are residents or citizens of the same state as Defendants.

4.     Rosen is an individual and citizen of the Commonwealth of Pennsylvania residing at 827 Parkridge Drive, Media, Pennsylvania 19063.

5.      Reich is an individual and citizen of the Commonwealth of Pennsylvania residing at 227 Cherry Street, Columbia, PA 17512.

## II.   **JURISDICTION AND VENUE**

6.      Jurisdiction is proper under 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

7.      This Court also has jurisdiction pursuant to 15 U.S. Code § 78aa.

8.      Venue in the Eastern District of Pennsylvania is proper under 28 U.S.C. § 1391 because Defendants reside in this District and the transactions at issue occurred in this District.

## III.   **INTRODUCTION**

9.      This matter arises out of the sale of securities (the "Shares") owned by Rosen in Steem Monsters, Corp. formerly Steem Monsters, LCC (the "Company").

10.      Both Defendants commit fraud by making false and misleading representations to the Plaintiffs regarding the Company's business, the Company's technology, the financial condition of the Company, the financial affairs of the Company, the value of the Company and the prospects for the Company to induce Plaintiffs to invest.  As a result, the Defendants are joint participants in the misconduct alleged in this complaint.

11.      Prior to the sale of the Shares, the Defendants falsely touted the Company's principal business (an online card game) as the "number one crypto game in the world" citing statistics based on the number of users and games played in order to induce the Plaintiffs to invest in the Company. These statistics, which help drive the value of the Company, were not real. Defendants knew the statistics were materially overstated by autonomous programs or "bots"

2

(short for robots) which act like users but are not real people.  In some cases, one or more of the Defendants actually created bots which inflated the statistics.

12.     In other words, the game was not popular among living people. It was dominated by bots playing the game on behalf of a relatively small amount of users or, possibly, on behalf the Defendants or the Company.

13.     Defendants represented the Company's user base to investors, like the Plaintiffs, by falsely treating the bots like real people.

14.     Defendants also touted corporate transactions which were going to generate hundreds of millions (sometimes billions) of dollars for the Company to induce Plaintiffs' investments. None of these transactions came to fruition and Defendants knew the transactions never had a reasonable chance of consummation as touted.

15.     Before the sale of the Shares, Defendants routinely shared the Company's financial statements with the Plaintiffs, in part, to induce the investments. Following the sale of the Shares, Defendants acknowledged to Plaintiffs that none of the financial statements were accurate.

16.     The inaccuracy of the financial statements fatally doomed the touted transactions Defendants claimed were worth hundreds of millions, and sometimes billions, of dollars. The inaccuracy of the financial statements means that the purported financial valuations of the Company (upon which Defendants knew Plaintiffs were relying) were false and misleading.

17.     In reality, the Company was not worth hundreds of millions, or billions, of dollars as touted. The Company was a start-up business with few real users and little assets relative to the purported value. The Company was insolvent or approaching insolvency from an operational standpoint in that the Company's expenses would soon exceed revenues.

18.     The financial position, performance, technology and value of the Company was misstated and exaggerated by Defendants (most blatantly by Reich) to enable the sale of shares in the Company to third parties such as the Plaintiffs who collectively invested more than $8.2 million, at inflated prices. Plaintiffs' investment was paid to Rosen instead of the Company.

19.     Upon partially discovering the extent to which the Defendants had misrepresented the condition of the Company, and that Defendants were pricing another transaction using a lower valuation for the Company, the Plaintiffs entered into amendment agreements with Rosen to remedy Plaintiffs' overpayment for the Shares.

20.     Rosen is now repudiating these amended agreements and contesting their validity.

21.     Attempts by the Plaintiffs to reach a mutual resolution with the Defendants have been rebuffed by Defendants.

22.     Plaintiffs seek, *inter alia*, rescission of the sale transactions and a return of their investments. Alternatively, Plaintiffs seek to enforce the amended agreements with Rosen.

## IV.   <u>BACKGROUND</u>

### The Company

23.     Defendants are, or were at relevant times, directors, officers, co-founders and principal shareholders of the Company.

24.     The Company was incorporated in Pennsylvania on September 17, 2018.

25.     Defendants are "affiliates" of the Company because Defendants directly, or indirectly through one or more intermediaries, control, are controlled by, or are under common control with, the Company.

**The Game**

26.     The Company's principal business is a digital card game (the "Game"). The Company sells digital trading cards to consumers for use in the Game. Some of the cards have more strategic value in the Game than other cards which, as billed by Defendants, makes the cards collectible and tradeable.

27.     The Game uses a "play-to-earn" model which is a hybrid between a game (although users have complained it involves little to no strategy or skill) and an investment vehicle for the players.  Success in the Game is largely dependent upon how much players "invest" in the Game.

28.     The "play to earn" model incentivizes users to employ large numbers of autonomous programs known as "bots" to register as users and play the Game. Defendants were aware of this and Reich actually helped create bots for certain large users which human players of the Game sometimes describe as "whales" due to their size. By most accounts, the Game was dominated by the bots owned by a small number of whales.

29.     Defendants had no incentive to limit the use of bots because the bots materially and artificially inflated the Company's user statistics which Defendants fraudulently touted to secure investors knowing that the statistics were false and misleading because the vast majority of users were not real people.[1]

30.     Defendants used the inflated user statistics to obtain investments, including the investments from Plaintiffs.

**False and misleading representations**

31.     Defendants made various intentionally false and misleading representations to Plaintiffs prior to the sale of the Shares which were intended to induce Plaintiffs to invest. The

---

[1]     The Company eventually took steps on or about July 25, 2023 to limit bots in certain aspects of the Game.

misrepresentations include: (a) representations regarding major investments or transactions involving the Company; (b) representations regarding collaborations with major companies or brands which would lead to exponential rise in the Company's revenue and value; (c) representations with regard to the financial position and prospects of the Company; and (d) representations concerning the technological and operational functioning of the Company.

32. Based on these representations, the Plaintiffs entered into five (5) Stock Purchase Agreements between March 24, 2022, and April 7, 2022 worth approximately $8.2 million (collectively, the "Stock Purchase Agreements") with Matt Rosen to purchase shares owned by Rosen in the Company. The Shares and transactions were not registered with any state or federal regulatory agency.

33. The Defendants continued to make misrepresentations to the Plaintiffs after the sale of the Shares to hide Defendants' fraud and deceit. Despite these attempts, the Plaintiffs eventually realized Defendants' representations were materially false or misleading and that the value of the Company was materially overstated by Defendants.

**Representations with regard to the financial position
and performance of the Company**

34. Prior to the Stock Purchase Agreements, Defendants made numerous representations to Plaintiffs concerning the financial condition and performance of the Company which were materially false or misleading.

35. On November 11, 2020, Reich claimed to Plaintiffs that the Company's virtual "lands sale" raised over $225,000 in one (1) day. The sale involved "virtual" land in the Game and not physical real estate. Reich claimed the land sale occurred through an auction with fifty (50) entries at $7,500 each.

6

36.     Reich also claimed three more players wanted to register but did not pay in time. Reich claimed there was a "free for all" an hour later over the remaining three (3) regions which sold out in 21 seconds and that the forty-eight (48) hour volume on the secondary market was "off the charts."  Reich stated the Company had two more land sales coming up in November and December 2020 before a main sale starts in 2021.

37.     Reich's November 11, 2020 email closed with a solicitation of Plaintiffs stating "[w]e're in the process of closing our investment round and still have limited space for partners that are looking to get into the number one crypto game in the world. We'd love it if you choose to participate…" This solicitation, and all subsequent solicitations by Defendants, violated applicable securities laws including the Pennsylvania Securities Act, 70 P.S. § 1-101 *et seq*. (prohibiting, in part, offers to sell securities in Pennsylvania without appropriate exemption or registration and offers involving fraud).

38.     On November 15, 2021, Defendants shared a Performance Review Presentation with Plaintiffs which claimed the Game had a) over 1.4 million registered users; b) expected revenue of $3 million dollars per month; and c) expected new card sales revenue of $51 million dollars; and d) expected partnership revenue of $320 million dollars.

39.     These statistics were inflated and misleading. The Performance Review was not accurate.  The Performance Review failed to disclose that the vast majority of the users were bots and not real people.  There is also good reason to believe that the user statistics where completely fabricated. Approximately two months earlier, Reich stated in an interview that the Company had 25,000 users. Other estimates of users range from 4,000 to 40,000 real users and 1,000 active daily users. To the extent there were materially more "registered" users, they were autonomous "bots" and not real people. The bots do not drive revenue for the Company but they artificially and falsely

inflate the perceived value the Company. In fact, a large number of bots can be costly and can impinge on the revenue earned by the Company.

40.     The Performance Review Presentation also indicated that Company has a target goal to raise $300 million dollars. All of the Defendants' projections of future financial performance and revenue are baseless because the Company did not have accurate financial statements on which to base the projections.

41.     On December 6, 2021, Defendants provided the Plaintiffs with the Company's profit and loss statement for January 2021 through November 2021 along with balance sheet as of November 30, 2021. These documents showed that the Company had: a) revenue of $14,474,550.27; b) net income of $8,003,591.66; c) total assets of $20,785,593.26; d) total liabilities of $512,656.85; and e) equity of $20,272,936.41.  As Defendants acknowledged after the Stock Purchase Agreements, this financial information was inaccurate because the Company never produced accurate financial statements.

42.     On January 17, 2022, the Defendants made erroneous comments regarding pack sales in the Game. Rosen specified that 33% of the packs had 'sold out' and committed to around 6 million being sold by the end of the day. Rosen also represented, without any basis, that there would be 50,000 and 100,000 packs  sold per day for the foreseeable future, up to over 10 million. These figures were materially false.

43.     On February 1, 2022, the Defendants shared with Plaintiffs a purported valuation of the Company indicating a value of $386 million.  Defendant implied that the value would have been much higher if it were not for a 45% discount based on the Company being a closely held business.

44.     On February 10, 2022, the Defendants another valuation with the Plaintiff indicating the Company's value as of December 31, 2021 was $214 million.

**Defendants acknowledge the financial statements are inaccurate**

45.     Following the Stock Purchase Agreements, Defendants acknowledged that the Company never produced accurate financial statements.

46.     Business valuations, like the valuations provided by Defendants, are dependent upon accurate historical financial statements which the Company never produced.

47.     The Defendants intentionally used the false financial information, performance information and valuations to materially overstate the value of the Company to induce Plaintiffs to invest.

48.     Defendants shared this information with Plaintiffs knowing it was materially false or misleading.

49.     Plaintiffs relied upon these representations in entering into the Stock Purchase Agreements.

**Representations regarding investments or transactions with the Company**

50.     On June 23, 2021, the Defendants shared with Plaintiffs information concerning a transaction with a sports league ("Third Party 1") which was expected to earn the Company between $200 million to $400 million in revenue.

51.     On September 12 and 28, 2021, the Defendants provided Plaintiffs information concerning a $500 million transaction between the Company and a third party ("Third Party 2") which would result in the Company receiving $200 million in cash at closing and another $300 million would be paid in publicly traded shares of Third Party 2.

52.     In November 2021 the Defendants shared information with Plaintiffs indicating a third party ("Third Party 3") was interested in taking the Company public.

53.     On January 20, 2022, the Defendants shared information with the Plaintiffs concerning a transaction with a third party ("Third Party 3") which purported to value the Company at $3 billion with expected earnings of $503 Million in 2022. The transaction contemplated the Company would receive $411 million in cash and 283.1 million shares of Third Party 3's common stock at a price of $10 per share.

54.     On December 6, 2021, the Defendants shared with Plaintiffs information concerning a subscription facility between the Company and a third party ("Third Party 4") for $300 million.

55.     On December 6, 2021 the Defendants shared information concerning a potential transaction between the Company and an acquisition company ("Third Party 5").

56.     On December 22, 2021, January 10, 21, 31, 2022 and March 26, 2022, the Defendants informed the Plaintiffs about a proposed $300 million acquisition of the Company by a third party ("Third Party 6"). The information indicated the Company had a value of $3 billion to $4 billion and was supposed to close in March 2022.

57.     None of these transactions ever materialized.

58.     Defendants knew or should have known that the transactions had no real prospects of materializing, in part, because the Company has never produced accurate financial statements and that transactions of this magnitude would likely uncover Defendants' misrepresentations concerning the user base of the Company.

59.     Defendants shared the information concerning these transactions as a ploy to inflate the value of the Company in order to induce the Plaintiffs to purchase shares in the Company.

60.     Plaintiffs relied upon these representations in entering into the Stock Purchase Agreements.

**Representations regarding collaborations with major companies and brands**

61.     The Defendants made various representations to the Plaintiffs, claiming that the Company would be collaborating with reputable brands and influential companies. The Defendants assured the Plaintiffs that these collaborations would have an exponential impact on the revenues of the Company.

62.     On January 28, 2021, the Defendants provided the Plaintiffs with information concerning a collaboration with a third party sports union ("Third Party 7") wherein the Game is described as the "leading blockchain collectible card game in the world." The information included three alternate business models highlighting the worst to the best case scenarios. These models showed that the collaboration with the Third Party 7 would result in a rise in revenues to anywhere between $14-60 Million within one year.

63.     On February 18, 2022, the Defendants provided the Plaintiffs with information concerning an arrangement with another sports union ("Third Party 8") indicating the Company was on track to earn $200 million to $400 million per year from the arrangement.

64.     The arrangements with Third Party 7 never materialized and the arrangement with Third Party 8 did not result in a positive material impact on the Company's financial performance.

65.     There was never a reasonable basis for Defendants to believe that these transactions would have the impact the Defendants touted.

66.     Defendants shared this information with Plaintiffs knowing it was materially false or misleading in order to induce the Plaintiffs to buy shares of the Company from the Defendants.

67.     Plaintiffs relied upon these representations in entering into the Stock Purchase Agreements with the Defendants.

### Representations concerning the Company's technology

68.     Defendants repeatedly misrepresented to Plaintiffs (and to the consumers) that the cards are non-fungible tokens ("NFTs") which make each card unique and potentially valuable. However, the Defendants have admitted in other litigations in this District that the cards are not NFTs.

69.     Defendants repeatedly claimed publicly and to Plaintiffs that the Company utilizes decentralized blockchain technology with respect to the cards. At least one player has commenced litigation in this District against the Defendants alleging this claim is false. An expert report in that litigation describes blockchain use by the Game as "superficial" with all core aspects of the Game recorded on the Company's servers which are not decentralized.

70.     The Defendants claim the Company uses crypto-currency as part of the Game and the Defendants promote the concept that consumers may earn profits by collecting and trading the cards and otherwise participating in the Game.

71.     In February 2019, Reich acknowledged that the inclusion of the word, 'blockchain' on a company's website and the creation of cryptocurrency tokens can increase the amount of investments a company will receive by many multiples. As a result, the Defendants had a strong incentive to falsely represent that they were using NFTs and decentralized blockchain technology for the Game.

72.     Defendants made these misrepresentations concerning the Company's technology to make it appear the Company had a greater value to induce the Plaintiffs to make an investment.

73.     Plaintiffs reasonably relied on these misrepresentations while entering into the Stock Purchase Agreements.

### The Stock Purchase Agreements

74.     On March 24, 2022, to induce the Plaintiffs to purchase the Shares, Rosen represented and warranted that the Plaintiffs will not lose money as the Company is valued at $3.5 billion. At same time, Rosen represented he was structuring the sale as a purchase of his individual shares because the Company did not need the money. Unbeknownst to Plaintiffs, the Company desperately needed funds and was just a few months away from the first of two rounds of mass layoffs.

75.     Based on the representations made by the Defendants, which included false and misleading information about the Company as set forth in this complaint, the Plaintiffs and the Rosen entered into the following Stock Purchase Agreements which are more fully described in the following chart and true and correct copies of which are attached as exhibits as denoted, for the purchase of shares  of stock (the "Shares") in the Company which were owned by the Rosen:

| Exhibit | Date | Purchaser | Purchase Price | Shares |
|---|---|---|---|---|
| 1 | March 24, 2022 | SDV Opportunity Fund II, a Series of Side Door Ventures LP. | $500,006.35 | 42,919 |
| 2 | March 24, 2022 | BFF II PTE. LTD. | $3,499,997.85 | 300,429 |
| 3 | March 24, 2022 | SDV Follow 1G, a Series of Side Door Ventures LP. | $3,500,009.50 | 300,430 |
| 4 | March 29, 2022 | SDV Follow 1G, a Series of Side Door Ventures LP. | $199,995.55 | 17,167 |
| 5 | April 7, 2022 | SDV Follow 1G, a Series of Side Door Ventures LP. | $500,006.35 | 42,919 |

76.     The Shares, and the offer to sell, have not been registered under Securities Act of 1933, 15 U.S.C. § 77a *et seq.* or any state securities laws.

77.     The transactions effectuated pursuant to the Stock Purchase Agreements were directly, or indirectly, for the benefit of one or more of the  Defendants.

78.     Defendants did not make any filing with the Commonwealth of Pennsylvania in regard to the Shares or in connection with the Stock Purchase Agreement.

79.     Plaintiffs were not provided with a notice of the right to withdraw acceptance of the offer to purchase the Shares without incurring any liability to the seller, underwriter (if any) or any other person.

**The continuing misrepresentations**

80.     Following Plaintiffs' investments pursuant to the Stock Purchase Agreements, the Defendants continued to make misrepresentations about the Company which prevented Plaintiffs from becoming aware of the true financial condition and financial prospects of the Company and the Game.

81.     On or about April 14, 2022, Defendants shared information with Plaintiffs indicating the Company was going to go public with a valuation of $3.5 billion dollars.

82.     On May 9, 2022, Defendants shared presentations with Plaintiffs indication the Company's technology adoption is going well and ahead of schedule.

83.     On May 10, 2022, Defendants shared with Plaintiffs a presentation describing the progress of the Game, and noting there were 1.8 million users, 820,000 paying customers, and between one to five million transactions a day. The presentation claimed that the Game is a top 3 blockchain "DApp" (short for decentralized application) and is the "world's most popular blockchain game by daily users". The presentation also included images of professional athletes

from Third Party 7 on trading cards falsely implying that the relationship with Third Party 7 was still on track.

84.    The May 10, 2022 presentation indicated the Company had "revenue to date" (2019 through the time of the presentation) exceeding $43 million including revenue exceeding $23 million in 2021 (the revenue listed in the first 11 months of the year were inflated from the revenue disclosed to Plaintiffs on December 6, 2021) and $17 million by March of 2022. The presentation projected an incremental enterprise value for the Company of $20 billion and indicated there was a signed letter of intent for a $3.5 billion SPAC transaction for the Company. The purpose of the proposal was to attract additional investment.

85.    On May 26, 2022, Defendants reported to Plaintiffs that the Company had a year to date profit of $12,214,776. In a June 2, 2022 report to Plaintiffs, Defendants stated the Company had an $11,904,797 year-to-date profit.

86.    On June 7, 2022, Defendants reported to Plaintiffs that, even in the worst-case scenario, the Company will earn between approximately $160 million to $680 million. The Defendants also reported the Company had more than $15 million in cash and cryptocurrency. The Defendants reported potential collaborations with various sports leagues.

87.    On June 23, 2022, Defendants represented to Plaintiffs that the Company has a contract with a third party pursuant to which the Company is expected to earn between $200 million to $400 million.

88.    On November 10, 2022, the Defendants told Plaintiffs that various investors are looking to invest at least $20 million into the Company.

89.     On November 11, 2022, the Defendants reported to Plaintiffs that the Company had estimated revenue of $2,277,778 in October 2022 and had generated an average monthly revenue of more than $1.1 million from July 2022 to September 2022.

90.     On November 12, 2022, the Defendants shared a presentation with the Plaintiffs. Defendants reported, as of June 2022, expected revenue. of $99 million for 2022, $257 million for 2023 and $337 million for 2024.  The presentation also indicated the Company anticipated entering a partnership with multiple large and well-known entities. Defendants also reported the Company had 2 million registered users, 850,000 paying customers, and 2.5 billion games played as of June 2022.

### The problems begin to come to light

91.     On November 17, 2022, the picture was less rosy. Defendants informed the Plaintiffs that the Company was facing problems as its monthly revenues are $400,000 (as opposed to the previously reported estimated revenues in October 2022 of $2,277,778 and the average monthly revenues for July 2022 to September 2022 of more than $1.1 million) and the Company's monthly costs are $1.5 million. The Defendants stated the Company has approximately $10 million in cash and cryptocurrency and that the Company had between six (6) and ten (10) months of a remaining runway. Defendants informed Plaintiffs the Company was going to reduce its costs by, *inter alia*, reducing staff count and paying bonuses instead in the form of options.

92.     On December 29, 2022, the Defendants stated the Company had $27 million in revenue in 2022.

93.     By March 9, 2023, the Defendants reported that the Company had year to date: a) revenue of $887,423; b) expenses of $2,007,792; and c) loss of $1,120,369.

94.     On September 7, 2023, the Defendants shared with Plaintiffs a valuation which valued the Company at $40 million or  $2.42 per share.

95.     Following Plaintiffs' demand for representation on the board of directors of the Company, on September 29, 2023, Defendants informed Plaintiffs that personal liability could arise from membership in the board of directors because the Company was yet to produce accurate financial statements and the Company had not filed tax returns for 2022.

96.     On October 4, 2023, the Company entered into a transaction with another party which re-priced the Company at $40 million.

97.     The Defendants knew or should have known that the information they provided to the Plaintiffs was false or misleading. In particular, the Defendants knew or should have known that: a) the Company's financial statements were inaccurate particularly given that the Defendants subsequently admitted the inaccuracies; b) Defendant's statements concerning the prospects and valuations of the Company were materially overstated; c) the Defendants' representations about the Company's user base was either materially overstated and misleading or, perhaps, entirely fictional; d) the Company's technology was not as represented by Defendants to Plaintiffs.

98.     The Company's problems were extensive and must have existed for a substantial period of time but were actively concealed by the Defendants and were replaced with false and misleading reports concerning the Company and Rosen's representation prior to Stock Purchase Agreements that the Company did not need money.

**The amended Stock Purchase Agreements**

99.     The Plaintiffs began raising issues with the Defendants, in particular Rosen, concerning the value of their investments given the re-pricing of the Company in the recent transaction.

100.    To address these issues, Rosen agreed to amend the Stock Purchase Agreements (the "Amended Stock Purchase Agreements") to provide Plaintiffs with additional shares of the Company. True and correct copies of the Amended Stock Purchase Agreements are attached as exhibits as set forth, and described, as follows:

| Exhibit | Date | Purchaser | Shares |
|---------|------|-----------|--------|
| 6 | October 23, 2023 | BFF II PTE. LTD. | 1,607,295 |
| 7 | October 24, 2023 | SDV Follow 1G, A Series of Side Door Ventures LP | 229,776 |
| 8 | October 24, 2023 | SDV Opportunity Fund II, A Series of Side Door Ventures LP | 229,776 |
| 9 | October 24, 2023 | SDV Follow 1G, A Series of Side Door Ventures LP | 1,607,721 |
| 10 | October 24, 2023 | SDV Follow 1G, A Series of Side Door Ventures VP | 91,867 |

101.    Shortly after the execution of the Amended Stock Purchase Agreement, Plaintiffs representatives were appointed to the board of directors of the Company as required by the Amended Stock Purchase Agreements.

102.    Despite Plaintiffs demand, Rosen has not transferred, and has stated his refusal to transfer, the additional shares to Plaintiffs as required by the Amended Stock Purchase Agreements.

103.    On January 12, 2024, in a stockholder resolution approved by Rosen, Plaintiffs' representatives were removed from the board of directors of the Company in breach of the Amended Stock Purchase Agreements.

**COUNT I**
**BREACH OF CONTRACT**
**(Plaintiffs vs. Rosen)**

104.   Plaintiffs incorporate by reference each of the allegations contained in this pleading.

105.   Rosen represented and warranted in the Stock Purchase Agreements, *inter alia*, that:

> a.   Rosen has all requisite power and authority to execute and deliver this Agreement, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. Rosen has obtained all necessary approvals for the execution and delivery of this Agreement, the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Rosen and (assuming due authorization, execution, and delivery by Plaintiff) constitutes Rosen's legal, valid, and binding obligation, enforceable against Rosen in accordance with its terms.

> b.   The Shares have been duly authorized, are validly issued, fully paid and non- assessable, and are owned of record and beneficially by Rosen, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies and other arrangements or restrictions of any kind ("***Encumbrances***"). Upon consummation of the transactions contemplated by this Agreement, Plaintiff shall own the Shares, free and clear of all Encumbrances.

> c.   The execution, delivery and performance by Rosen of this Agreement does not conflict with, violate, or result in the breach of, or create any Encumbrance on the Shares pursuant to, any agreement, instrument, order, judgment, decree, law, or governmental regulation to which Rosen is a party or is subject or by which the Shares are bound.

> d.   No governmental, administrative, or other third-party consents or approvals are required by or with respect to

19

Rosen in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

106.   Rosen breached these representations and warranties because:

 a. the Shares were issued in violation of the Pennsylvania Securities Act of 1972, 70 P.S. § 1-101 *et seq.* (the "Pennsylvania Securities Act") in that they were not registered as required by 70 P.S. § 1-201 and the transactions and Shares are not exempt from registration;

 b. The Shares are subject to Encumbrances in that they may not be freely pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed by Plaintiff; and

 c. Rosen violated applicable law (as more fully described in this complaint) by offering and selling the Shares to Plaintiffs by (i) employing a device, scheme or artifice to defraud Plaintiffs; making untrue statements of a material fact or by failing to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;  or (iii) engaging in acts, practice or course of business which operates or would operate as a fraud or deceit upon any person.

107.   As a result of Rosen's breach of these representations and warranties, Plaintiffs are entitled to rescind the Stock Purchase Agreement and obtain the return of the "Purchase Price" as defined in the Stock Purchase Agreements.

108.    Plaintiffs were damaged by the Rosen's breach of these representations and warranties in the amount of the "Purchase Price" (as defined in Stock Purchase Agreements) plus additional compensatory damages as may be provided by applicable law or the Stock Purchase Agreements.

109.    Plaintiffs are willing to tender the Shares to Rosen upon return of the Purchase Price.

WHEREFORE, Plaintiffs respectfully demand the entry of judgment a) rescinding the Stock Purchase Agreements; b) awarding damages to Plaintiff in the amount of the "Purchase Price" (as defined in Stock Purchase Agreements) plus additional compensatory damages as may be provided by applicable law or the Stock Purchase Agreements.

**COUNT II**
**PENNSYLVANIA SECURITIES ACT**
**70 P.S. § 1-201 and 70 P.S. § 1-502**
**(Plaintiffs vs. Both Defendants)**

110.    Plaintiffs incorporate by reference each of the allegations contained in this complaint.

111.    The Shares are not registered in the Commonwealth of Pennsylvania pursuant to the Pennsylvania Securities Act.

112.    The Pennsylvania Securities Act, at 70 P.S. § 1-201, makes it unlawful for any person to offer or sell any security in the Commonwealth of Pennsylvania unless the security is registered under Pennsylvania Securities Act, the security or transaction is exempted under section 70 P.S. § 1-202 (exempt securities) or 70 P.S. § 1-203 (exempt transactions) or is a federally covered security (as defined in the Pennsylvania Securities Act).

113.    The Shares do not qualify for any of the exemptions under 70 P.S. § 1-202.

114.    The offer and sale of the Shares pursuant the Stock Purchase Agreements are not exempt transactions pursuant to 70 P.S. § 1-203.

115.    As a result, Defendants violated section 1-201.

116.    Pursuant to 70 P.S. § 1-502, Rosen is liable to Plaintiffs for the consideration paid for the Shares together with interest at the legal rate from the date of payment.

117.    Plaintiffs are willing to tender the Shares in exchange for the Purchase Price of the Shares less any amount deductible pursuant to section 1-502.

118.    Pursuant to 70 P.S. § 1-503, Reich is liable to Plaintiffs because he materially aided in the act or transaction constituting the violation of the Pennsylvania Securities Act.

WHEREFORE, Plaintiffs respectfully demand the entry of judgment a) rescinding the Stock Purchase Agreements; b) awarding damages to Plaintiff in the amount of the "Purchase Price" (as defined in Stock Purchase Agreements) plus additional compensatory damages and punitive damages as may be provided by applicable law or the Stock Purchase Agreements.

## COUNT III
## PENNSYLVANIA SECURITIES ACT
## 70 P.S. § 1-401
### (Plaintiffs vs. Both Defendants)

119.    Plaintiffs incorporate by reference each of the allegations contained in this complaint.

120.    As set forth in this complaint, Defendants violated Section 1-1401 of the Pennsylvania Securities Act, 70 P.S. § 1-401, in connection with the offer and sale of the Shares in Pennsylvania by, directly or indirectly: (a) to employing a device, scheme or artifice to defraud Plaintiffs; (b) making any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they

are made, not misleading; or (c) to engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon Plaintiffs.

121.    Without limitation, Defendants violated section 1-401 by:

    a.    providing Plaintiffs will untrue and misleading statements concerning the Company's financial and operational performance, the prospects for the Company, the future plans for the Company, the Company's need for cash and the current and  future value of the Company; and

    b.    employing an integration clause in the Stock Purchase Agreements (to the extent the integration clause is not void pursuant to 70 P.S. § 1-507) as a device, scheme, artifice, act, practice or course of business which operates or operates as a fraud or deceit upon Plaintiffs if used to insulate Defendants from liability for their misrepresentations.

122.    Pursuant to 70 P.S. § 1-501, Defendants are liable to Plaintiffs as a result of their untrue statements of a material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

123.    Plaintiffs did not know about the untruths or omissions.

124.    As a result, Defendants are liable to Plaintiffs for the consideration paid for the Shares together with interest at the legal rate from the date of payment.

125.    Plaintiffs are willing to tender the Shares in exchange for the Purchase Price of the Shares less any amount deductible pursuant to section 1-502.

WHEREFORE, Plaintiffs respectfully demand the entry of judgment a) rescinding the Stock Purchase Agreements; b) awarding damages to Plaintiff in the amount of the "Purchase Price" (as defined in Stock Purchase Agreements) plus additional compensatory and punitive damages as may be provided by applicable law or the Stock Purchase Agreements.

**COUNT IV**
**FRAUD OR MISREPRESENTATION**
**(Plaintiffs vs. Both Defendants)**

126.    Plaintiffs incorporate by reference each of the allegations contained in this complaint.

127.    As more fully described in this complaint, Plaintiffs made intentional or negligent false representations to Plaintiffs concerning the Company's financial and operational performance, the prospects for the Company, the future plans for the Company, the Company's need for cash and the current and future value of the Company. The Defendants misstatements and omissions were material and made with an intent to deceive, manipulate or defraud.

128.    The Defendants' material misstatements and omissions were made in connection with the offer and purchase of the Shares by Plaintiffs.

129.    The Defendants' material misstatements and omissions were intended to induce the Plaintiffs to purchase the Shares.

130.    The Plaintiffs relied on the Defendants' misstatements and omissions in connection with the Purchase of the Shares.

131.    The Plaintiffs suffered economic damages in the amount of the Purchase Price for the Shares.

132.    Plaintiffs' losses are causally connected to the Defendants material misrepresentations and omissions. Had Plaintiffs known the true facts concerning the Company, the Plaintiffs would not have purchased the Shares.

133.    Plaintiffs did not know about the untruths or omissions.

134.    As a result, Defendants are liable to Plaintiffs for the consideration paid for the Shares together with interest at the legal rate from the date of payment.

135.    Plaintiffs are willing to tender the Shares in exchange for the Purchase Price of the Shares less any appropriate deductible amount.

WHEREFORE, Plaintiffs respectfully demand the entry of judgment a) rescinding the Stock Purchase Agreements; b) awarding damages to Plaintiff in the amount of the "Purchase Price" (as defined in Stock Purchase Agreements) plus additional compensatory and punitive damages as may be provided by applicable law or the Stock Purchase Agreements.

## COUNT V
## SECURITIES AND EXCHANGE ACT
### 15 U.S.C. § 78j(b)
### (Plaintiffs vs. Both Defendants)

136.    Plaintiffs incorporate by reference each of the allegations contained in this complaint.

137.    As set forth in this complaint, Defendants violated 15 U.S.C. § 78j(b), as implemented by Rule 10b-5 of the Securities and Exchange Commission, in connection with the offer and sale of the Shares by, directly or indirectly: (a) to employing a device, scheme or artifice to defraud Plaintiffs; (b) making any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon Plaintiffs.

138.    Without limitation, Defendants violated section 78j(b) and Rule 10b-5 by:

      a.    providing Plaintiffs will untrue and misleading statements concerning the Company's financial and operational

performance, the prospects for the Company, the future plans for the Company, the Company's need for cash and the current and  future value of the Company; and

b.    employing an integration clause in the Stock Purchase Agreements (to the extent the integration clause is not void) as a device, scheme, artifice, act, practice or course of business which operates or operates as a fraud or deceit upon Plaintiffs if used to insulate Defendants from liability for their misrepresentations.

139.   The Defendants misstatements and omissions were material and made with an intent to deceive, manipulate or defraud.

140.   The Defendants' material misstatements and omissions were made in connection with the offer and purchase of the Shares by Plaintiffs.

141.   The Defendants' material misstatements and omissions were intended to induce the Plaintiffs to purchase the Shares.

142.   The Plaintiffs relied on the Defendants' misstatements or omissions in connection with the purchase of the Shares.

143.   The Plaintiffs suffered economic damages in the amount of the Purchase Price for the Shares.

144.   Plaintiffs' losses are causally connected to the Defendants material misrepresentations and omissions. Had Plaintiffs known the true facts concerning the Company, the Plaintiffs would not have purchased the Shares.

145.   Plaintiffs did not know about the untruths or omissions.

146.    As a result, Defendants are liable to Plaintiffs for the consideration paid for the Shares together with interest at the legal rate from the date of payment.

147.    Plaintiffs are willing to tender the Shares in exchange for the Purchase Price of the Shares less any appropriate deductible amount.

WHEREFORE, Plaintiffs respectfully demand the entry of judgment a) rescinding the Stock Purchase Agreements; b) awarding damages to Plaintiff in the amount of the "Purchase Price" (as defined in Stock Purchase Agreements) plus additional compensatory and punitive damages as may be provided by applicable law or the Stock Purchase Agreements.

## COUNT VI
## **BREACH OF CONTRACT**
### (Amendments to Stock Purchase Agreements)
### (Plaintiffs vs. Rosen)

148.    Plaintiffs incorporate by reference each of the allegations contained in this complaint.

149.    Plaintiffs bring this count against Rosen in the alternative in the event the Plaintiffs are not entitled to any relief with respect to Plaintiffs' other counts in this complaint.

150.    Defendant breached the Amended Stock Purchase Agreements by failing, and refusing to, issue the additional shares to Plaintiffs as required by the Amended Stock Purchase Agreements and by removing the Plaintiffs' representatives from the board of directors of the Company.

151.    The additional shares and board representation are unique items and Plaintiffs are entitled to the remedy of specific performance requiring Rosen to issue the additional shares to Plaintiffs and to appoint the Plaintiffs' representatives to the board of directors of the Company.

152.   Alternatively, Plaintiffs have been damaged in the amount of the value of: a) the additional shares which Rosen failed to deliver to Plaintiffs; and b) the board of directors representation.

**WHEREFORE**, Plaintiff respectfully requests judgment in specific performance or, in the alternative damages for Plaintiffs' losses along with all other relief available under applicable law or the agreements between the parties.

**BUCHANAN INGERSOLL & ROONEY PC**

BY: *s/ H. Marc Tepper*
H. Marc Tepper (PA ID 49084)
Mark Pfeiffer (PA ID 76245)
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 191002
T:  (215) 665-8700
F:  (215) 665-8760
marc.tepper@bipc.com
mark.pfeiffer@bipc.com

*Attorneys for Plaintiffs*

Date:   March 22, 2024